# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DONALD RAY MIDDLEBROOKS,       )
                              )
    Petitioner,         )
                              )
v.                            )    No. 3:03-00814
                              )    Chief Judge Haynes
                              )
ROLAND COLSON,                )
                              )
    Respondent.         )

## MEMORANDUM

Before the Court is the Respondent's motion for judgment on the pleadings (Docket Entry No. 80), contending that Petitioner's claims that were previously determined to be procedurally defaulted cannot be considered in light of Martinez v. Ryan, 132 S. Ct. 1309 (2012) and Trevino v. Thaler, 133 S. Ct. 1911 (2013). In response, Petitioner contends that he is entitled to relief and/or an evidentiary hearing because: (1) Martinez applies to his defaulted ineffective assistance of counsel claims; (2) under Martinez his ineffectiveness of counsel claims are "substantial;" and (3) his post-conviction counsel's ineffectiveness for failing to raise and/or present claims regarding the ineffective assistance of trial counsel during post-conviction proceedings will establish cause and prejudice to excuse his procedurally defaulted claims at issue. At this hearing, Petitioner seeks to present proof about his trial counsel and post conviction counsel.

### A. State Courts' Factual Findings

In evaluating this motion, the significant facts underlying Petitioner's murder conviction and

death sentence are the starting point.[1] On Petitioner's initial direct appeal, the Tennessee Supreme

Court stated those facts at the guilt stage as follows:

> The State's proof introduced at the guilt phase of the trial demonstrated that on the evening of Sunday, April 26, 1987, around 7:00 p.m., the victim, Kerrick Majors, a 14–year–old black male, was with four friends on Gallatin Road in East Nashville, Tennessee, when they saw a table with a "lot of stuff" being set up across the street as a flea market by three homeless street persons: the defendant, Donald Middlebrooks (a 24–year–old white male); his wife, 17–year–old Tammy Middlebrooks; and their companion, 16–year–old Roger Brewington. The five boys ran across Gallatin Road and were looking at the flea market when Tammy Middlebrooks called out, "Hey, leave our stuff alone!" The boys started running. The defendant and Brewington chased them until they caught Majors. Brewington grabbed Majors in a "sleeper hold" around his neck and head. The defendant held his hand. When Majors said, "Hey man, you know me," Brewington responded, "Shut up, you nigger." Shannon Stewart and another of the boys, Tony Watson, saw the two men drag Majors toward the table and observed the defendant strike him in the face, knocking him to the ground. Frightened, the boys took off running. Later that evening, they reported these events to the victim's mother, who called the police.

> The next afternoon, Kerrick Majors' nude body was discovered lying face up in a dry creek bed under a foam mattress in a heavily wooded area behind a drugstore on Gallatin Road in the area where the defendant and Brewington had caught Majors. A bloodstained T-shirt was tied around his neck. A red rope belt was tied around Majors' left wrist, and there was a two-inch laceration in his right wrist. Abrasions, swelling, and bruising were present on the victim's head, his left eye, his nose, his lips, and inside his mouth. An "X" with a vertical line running through it had been cut into his chest. The forensic pathologist, Dr. Charles Harlan, testified that these incisions had been made while Majors was alive. There were two deep stab wounds in the center of the body. One of these penetrated the left lung and pulmonary artery and caused the victim to bleed to death over a period of ten to thirty minutes, during part of which Majors was conscious. Investigating officers noticed a smell of urine about the face, and there were bruises and skinned areas on the back. A wooden stick with blood stains on one end was found lying close to the victim's head.

---

[1] As discussed infra, Martinez represents a "narrow exception" to the procedural default doctrine,132 S. Ct. at 1315, and is available only for "substantial" claims. Trevino, 133 S. Ct. at 1918. The claims at issue focus on sentencing that involves a weighing process of the evidence of the offense and any mitigation proof. See Skipper v. South Carolina, 476 U.S. 1, 8 (1986).

Around 1:10 a.m. on April 28, police investigators met Brewington at a doughnut shop several miles from the Gallatin Road area. Brewington directed the officers to the location of a knife with a brass knuckle handle, which was bloodstained. Dr. Harlan testified that this knife could have inflicted the deep stab wounds on the victim's body. Brewington also directed the police to a wooded area between Gallatin Road and Ellington Parkway in Nashville where, around 7:00 a.m. on April 28, Donald and Tammy Middlebrooks were apprehended at a small plywood shack. The defendant, who resisted the arresting officers, had a knife with him. He was arrested with the aid of police dogs, taken to the hospital for treatment of the dog bites, and later transported to police headquarters.

At 12:30 p.m. that day, the defendant gave a lengthy video-taped statement about his involvement in the death of Kerrick Majors. The defendant admitted participating in the beating and mistreatment of Majors, but described his role as minor and depicted Roger Brewington as the primary perpetrator of the offense. After Majors was caught, Middlebrooks said Brewington suggested they "have some fun," and the three of them took Majors back into the woods. His hands were tied. Brewington slapped him, beat him with the knife's brass knuckles, hit him with a stick, and urinated into his mouth. The defendant admitted striking Majors with his open hand and on the leg with a switch. Defendant said that his wife Tammy had slapped Majors and burned Majors' nose with a cigarette lighter as Brewington urged her on. Brewington hit Majors on his testicles, threatened to cut "it" open, stuck a stick up Majors' anus, hit him some more with the brass knuckles, wiped the victim's blood on himself, beat his mouth and tongue with a stick, dropped the knife on him, gagged him, and slashed his wrist. Finally, when the defendant asked Brewington to stop because the victim's crying and pleading were getting on his nerves, Brewington gave the victim "the kiss of death" on the forehead. Brewington then gave the defendant the knife and told him to stab Majors. When the defendant refused, Brewington stabbed Majors. The defendant then reluctantly stabbed the victim, according to him, "to prove to Roger that I guess I was cooler" and to put Majors out of his misery. In a previous statement, however, the defendant had said that he had stabbed Majors twice. The victim's ordeal began at 7:30 p.m. and ended at 11:00 p.m. that night with the stabbing.

The next day, the defendant said he and Brewington went back to where they had left the body. Brewington kicked it and made the "X" lacerations at this time. The defendant said he then covered Majors with a foam mattress. The defendant admitted that before beating and killing Majors, he and Brewington had drunk alcohol and smoked marijuana.

The defendant presented no proof.

State v. Middlebrooks, 840 S.W.2d 317, 322-25 (Tenn. 1992), cert. denied 510 U.S. 124 (1993)).

After the jury found Petitioner guilty of the substantive offense, there was a sentencing hearing at which Petitioner presented mitigation proof.

In the sentencing phase of the trial, the state incorporated the evidence presented at the guilt phase and introduced photographs of the victim's body and of Roger Brewington. The defendant's main theory was that he was mentally ill and that infliction of prolonged torture like that perpetrated on the victim was inconsistent with his personality. His younger half-sister, Sharon Fuchs, described their deprived and unstable childhood growing up in Texas. According to her, the defendant's father had died when he was four, and he had been subjected to mistreatment by his mother's husbands and boyfriends. The crucial change in his personality, however, had occurred after he was sodomized in his early teens by an adult male cousin who had been baby-sitting him and his sister. After that, his grades dropped at school, he began to run away from home, and becoming emotionally disturbed, was committed to the Waco State Home for Children but ran away from that institution. Eventually, defendant was imprisoned for his role in stealing a combine. While confined, he was stabbed in the head with an ice pick. He then began having grand mal seizures. The defendant had a history of admissions to mental hospitals and mental health facilities in Texas. His sister described him as passive and nonviolent and related how they had been cared for by a black woman, whom the defendant had loved. She said her brother had had black friends and was not a racist.

In Fuchs' cross-examination, the state introduced a document written by Middlebrooks entitled "Debow's Revenge," in which the defendant listed Texas law enforcement officers upon whom he planned vengeance for their offenses against him. In a section called "Justified Death Plan," the defendant described the tortures he intended to inflict upon these persons. Fuchs explained that the document was written after the defendant had been released in May 1986 from the Austin State Hospital, where he had been undergoing psychiatric treatment, and testified that her brother had never acted on the threats in the document.

Dr. Jay Woodman, a clinical psychologist, also testified that he had interviewed, tested, and evaluated the defendant. He diagnosed the defendant as suffering from a severe borderline personality disorder, with a secondary diagnosis of an adjustment disorder with depressed mood, malingering, polysubstance abuse, antisocial personality disorder, and a seizure disorder by history. Dr. Woodman described the defendant as a passive follower, impulsive, and unable to engage in inflicting torture for any protracted period of time. Dr. Woodman said the defendant's intelligence was in the low-average category, and that he had reviewed "Debow's Revenge" and thought that it was consistent with the fantasies generated by the intense inner-personal anger of someone suffering from a borderline personality disorder. Dr. Woodman felt that with the proper medication, the defendant could behave in the

4

structured environment of a prison if given a life sentence.

> Based on the proof, the jury found the existence of two aggravating circumstances beyond a reasonable doubt. The jury found that (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39–2–203(i)(5) (1982), and that (2) the murder was committed while the defendant was engaged in committing a felony, Tenn. Code Ann. § 39–2–203(i)(7) (1982). In addition, the jury found that the two aggravating circumstances outweighed the mitigating circumstances. As a result, the jury sentenced the defendant to death.

Id. at 325-26.

Petitioner had two sentencing hearings as the Tennessee Supreme Court explained in its second review of Petitioner's sentencing: "on appeal, this Court affirmed Middlebrooks' conviction but remanded the case for resentencing because the (i)(7) felony murder aggravating circumstance used to impose the death sentence duplicated the offense of felony murder and therefore failed to narrow the class of death-eligible defendants under Article I, Section 16 of the Tennessee Constitution." Middlebrooks, 995 S.W.2d at 552-53 (emphasis added with footnotes omitted) (citing State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992)). In Petitioner's second direct appeal, the Tennessee Supreme Court made findings on Petitioner's proof, including expert proof on Petitioner's mental illness and its effect on Petitioner's capacity to commit the crime:

> We begin by reviewing the evidence introduced at the resentencing hearing. On the day of the murder, April 26, 1987, Donald Ray Middlebrooks, a twenty-four-year-old white male, his wife, Tammy Middlebrooks, a seventeen-year-old white female, and their friend Roger Brewington, a sixteen-year-old white male, had set up a make-shift flea market in East Nashville. When Kerrick Majors, the fourteen-year-old black male victim, and four of his friends walked over and began looking at the items on the table, Tammy Middlebrooks yelled "Hey, ya'll niggers leave our stuff alone."

> Donald Middlebrooks and Brewington chased after Majors and the other boys. Shannon Stewart testified that as he fled from the scene, he saw Brewington grab Majors and drag him toward the table, where Middlebrooks struck Majors in the face and knocked him down. Stewart heard Middlebrooks order Majors to "shut up

5

nigger." The boys who made it to safety told Majors' mother what had happened. Majors' mother called the police and also searched for her son. The next day Majors' naked body was found lying face up in a dry creek bed under a foam mattress in the woods near the area where Majors had been abducted.

Bruises, scrapes, abrasions, and burns covered Major's body. A woven belt was strapped around his left wrist. A large laceration was sliced across his right wrist. Two large lacerations made by a sharp instrument formed an "X" across his chest. A bloody and swollen gash was above his left eye. His nose was bloody, red, badly burned, and had pieces of skin missing. His lips were swollen and lacerated, and the inside of his mouth was bloody and lacerated. His testicles were badly swollen, and his legs were covered in blood down to his feet. There was urine on different parts of his body and on a rag tied in a tight knot around his neck that had been used as a gag in his mouth. A bloody stick lay next to his head. Finally, there were two deep stab wounds in his chest a couple of inches apart.

The autopsy indicated that the cause of death was a stab wound to the chest and that the murder weapon had been plunged to a depth of 3.3 inches. The "X" carved into Majors' chest was inflicted before the stab wounds, and at least one of the stab wounds was made prior to his death. Majors was alive and conscious throughout the infliction of the injuries and wounds. Majors lived a minimum of five to six minutes and a maximum of thirty minutes from the time of the stab wounds. He also would have been conscious part of the time while bleeding to death after being stabbed.

Two days after the murder, Brewington voluntarily notified the police that Donald Middlebrooks and Tammy Middlebrooks were involved in the murder. He showed the officers a bloodstained knife with a brass knuckle handle that had been used on Majors. Brewington also told the officers where to find Middlebrooks and his wife.FN4

> FN4. All three were charged with Majors' murder. Brewington was eventually tried as an adult and convicted of first degree murder, aggravated kidnapping, and armed robbery and sentenced to consecutive sentences of life, 40 years, and 35 years, respectively. Because he was a minor, he was not eligible for the death penalty. See State v. Brewington, No. 89–232–III, 1990 WL 83406 (Tenn. Crim. App. June 20, 1990), perm. app. denied, (Tenn. Oct. 1, 1990). Tammy Middlebrooks pled guilty to first degree murder and was sentenced to life imprisonment.

After being arrested, Middlebrooks gave a video-taped confession to the police in which he admitted his own involvement but described Brewington as the leader. According to Middlebrooks, after dragging Majors into the woods, Brewington tied Majors' hands and then slapped him, beat him with brass knuckles, urinated in his mouth, and made him swallow. Middlebrooks said that Brewington also beat Majors' testicles, threatened to cut "it" open,

6

beat his mouth and tongue with a stick, and stuck a stick in Majors' anus. Whenever Majors resisted or screamed, Brewington continued to beat and slap him. Brewington told Majors he was taking him "back to the days of Roots." Brewington "dropped" the knife repeatedly on top of Majors, gagged him, and slashed his wrist. Middlebrooks stated that Tammy Middlebrooks also slapped Majors and burned his nose with a cigarette lighter.

Middlebrooks said that Majors was crying and begging them to stop. When Majors pleaded that all he wanted to do was to "go to school and get an education," Brewington replied "F—— you, nigger." Middlebrooks also said that Majors' cries were getting on his nerves so he asked Brewington to stop. According to Middlebrooks, Brewington then kissed Majors on the forehead and told him that it was "the kiss of death."

In the video-taped confession, Middlebrooks admitted stabbing Majors once and striking him across his legs with a switch. Middlebrooks explained that both he and Brewington stabbed Majors once. In a prior statement, however, Middlebrooks claimed to have inflicted both stab wounds. He also claimed he did not stop the torture because he was afraid of Brewington and is "scared to fight." At another point, Middlebrooks contended that he stabbed Majors to prove he was "cooler" than Brewington.

According to the State's proof, fourteen-year-old Majors was small for his age.FN5 He was described as a good student who loved school. He was not a violent person, nor did he carry a weapon. Since his murder, his mother's health has deteriorated. She has been on medication and will not leave the house except for doctor appointments. She has had a nervous breakdown, suffers from panic attacks, and has not been able to sleep at night since the murder. Majors' older brother blames himself for Majors' death and now suffers from mood swings.

> FN5. The autopsy indicated that Kerrick Majors was 4' 11" tall and weighed 112 pounds.

Shannon Stewart testified that he had spoken with Middlebrooks the morning of the murder. Middlebrooks had told Stewart that he was a member of the KKK, that he "hated niggers," and that he punched a black man just for saying hello. Stewart also testified that he overheard Middlebrooks order Majors to "shut up nigger."

The defense introduced mitigation evidence as follows: Middlebrooks' cousins, James and Carol Sue Little, and his half-sister, Sharon Fuchs, testified about Middlebrooks' childhood. Middlebrooks grew up in Texas. His father died when he was four. His mother remarried and had another child, Ms. Fuchs, before she again divorced. Middlebrooks' mother either left the children at night with relatives or else would take them to bars with her.

According to the proof, Middlebrooks' mother would often bring men to the house, and the children sometimes heard or saw their mother having sex. Ms. Fuchs testified that sometimes

7

these men would molest her while her mother watched. She further testified that she, Middlebrooks, and other children in the family were molested by different family members. For example, Middlebrooks was often left alone with a male relative who had sexually abused him, and Middlebrooks' mother would grab him between his legs and also watch him use the bathroom. According to Sharon Fuchs, the small town in which they grew up lacked counseling services or social service agencies where they could seek help for sexual abuse. According to her, no one in the family ever discussed or admitted the family's problems.

The proof further indicated that Middlebrooks was often angry and got into trouble. He was sent to a Methodist Home for Children in Waco for two years. Later, he was twice sent to prison. Between prison stays, Middlebrooks started to have seizures. On one occasion he climbed a water tower and threatened to commit suicide. He was hospitalized more than once at a mental institution.

A psychologist, Dr. Jeffrey L. Smalldon, performed neuropsychological and psychological evaluations of Middlebrooks. From these evaluations, interviews, testing, and prior education and medical records, Smalldon concluded that Middlebrooks has a severe borderline personality disorder. Middlebrooks exhibited several characteristics of the disorder including inconsistent behavior, instability of mood, a marked identity disturbance, impulsive and reckless behavior, poor anger control, and recurring suicidal or self-destructive acts. **Smalldon testified that the documents from other mental health professionals who have evaluated Middlebrooks indicate that he suffers from substance abuse, psychotic personality disorder, and schizophrenia. Middlebrooks also suffers a mild degree of organic brain impairment which causes him to be more impulsive and less able to delay his responses. Finally, Smalldon testified that Middlebrooks has also exhibited characteristics of adults who were sexually abused as children.**

During cross-examination, **Dr. Smalldon admitted that Middlebrooks confessed to a greater involvement in Majors' death than he had in the video-taped confession. For instance, Smalldon disclosed that Middlebrooks admitted to him that it was his idea to hold Majors for ransom, that he helped tie Majors up, and that he urinated on Majors. In an attempt to resolve the discrepancies between the video-taped confession to the police and the confession made to him in the interview, Smalldon explained that Middlebrooks is a chronic liar. Dr. Smalldon conceded that Middlebrooks had never expressed any remorse to him. Smalldon agreed that there were some indications in the medical records of Middlebrooks' malingering, but testified that these indications were not inconsistent with mental illness.**

In rebuttal, the **State introduced the testimony of two experts indicating that Middlebrooks was exaggerating his mental illness symptoms, that he was competent to stand trial, that he did not have a defense of insanity, and that he was not committable. One expert testified that he could not say whether Middlebrooks was mentally ill. The other expert testified that he made no finding of mental illness and did not consider a personality disorder to be a mental illness.**

After considering the evidence, the jury concluded that the aggravating factor set forth in Tenn. Code Ann. § 39-2-203(i)(5), that the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," outweighed the evidence of mitigating factors. Accordingly, the jury sentenced Middlebrooks to death for the murder of Kerrick Majors.

Middlebrooks, 995 S.W.2d at 553-56 (emphasis added).

### B. Analysis of the Defaulted Claims

### Petitioner's Earlier Habeas Proceedings

To decide this motion, the Court reviews the Sixth Circuit's ruling in Petitioner's earlier appeal in which the Petitioner's defaulted ineffective assistance of trial counsel claims were discussed. Middlebrooks v. Bell, 619 F.3d 526 (6th Cir. 2010). In the earlier habeas proceedings, this Court conducted an evidentiary hearing. Id. at 534. On appeal, the Sixth Circuit discussed the testimony about Petitioner's trial and post-conviction counsel as well as mitigation proof that was not presented in the earlier state proceedings:

1. Failure to Investigate and Present Evidence of Brain Damage

In Claim 9(a) of his habeas petition, Middlebrooks claims that his attorneys failed to investigate and present evidence of Middlebrooks's brain damage and related seizure disorder and mental illness that would have enhanced his mitigation case. The core of his argument is that counsel should have arranged for an MRI or PET scan of Middlebrooks's brain. In support of his claim, Middlebrooks presents an MRI and a PET scan paid for by his habeas attorneys and affidavits from several neuroscientists stating that those scans reveal abnormalities in the areas of Middlebrooks's brain responsible for emotions, behavior control, and social judgment.

9

As a threshold matter, the State argues that this claim is procedurally defaulted. Contrary to the district court's opinion, Middlebrooks did present this claim to the state courts, pleading in his petition for postconviction relief counsel's "failure to move for expert assistance of a neurologist who could have conducted necessary testing and provided expert testimony regarding the issue of brain damage and its effect upon Petitioner." J.A. at 1165. Problematically, however, Middlebrooks failed to offer any authority in support of this claim on postconviction appeal, in contravention of state-court procedural rules. We consider the Maupin factors to determine whether those state-court rules now bar our review.

Tennessee Court of Criminal Appeals Rule 10(b) provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure provides that an appellant's brief must contain "[a]n argument ... including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record," and Rule 27(g) requires attorneys to cite specific pages when citing the record. Middlebrooks failed to comply with these court rules when he merely listed his ineffective-assistance-of-counsel claim among several others in an addendum to his appellate brief in an effort "to preserve these issues as much as is possible." J.A. at 1284-85. The state appeals court actually enforced the procedural rules when it held that all claims listed in the addendum "are waived" because Middlebrooks "failed to reference the record, cite any authority, or present any argument regarding these issues." See Middlebrooks, 2003 WL 61244, at *12 (citing Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)(7), (g)). Finally, a review of Tennessee cases indicates that these appellate court rules are firmly established, and Middlebrooks does not argue otherwise. See State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App.2003); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App.2000); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App.1997); see also Lewis v. Tennessee, 279 Fed. Appx. 323, 326 (6th Cir.2008) (unpublished opinion) (finding procedural default based on state court's application of Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)); Killebrew v. Bernhardt, No. 94-6567, 1995 WL 712761, at *1 (6th Cir. Dec. 1, 1995) (unpublished opinion) (same).

Accordingly, Claim 9(a) is procedurally defaulted unless Middlebrooks can demonstrate cause and prejudice or that a miscarriage of justice will result. Middlebrooks relies on the former exception, offering as cause the state postconviction court's denial of his request for funding to hire a neuroscientist who could perform MRI and PET scans. As the State points out, in support of his argument Middlebrooks cites only cases holding that 28 U.S.C. § 2254(e)(2) does not prevent the district court from holding an evidentiary hearing when the petitioner's failure to develop the record in state court resulted from the state courts' denial of funds. These cases can help Middlebrooks put his new evidence before a federal

habeas court, but they do not help him establish cause for procedural default. Notwithstanding the citation of inapposite cases, however, Middlebrooks's argument is properly directed at procedural default. He argues in his reply brief that he "failed to present evidence relating to brain damage ... because he was denied funding" to develop that evidence. Reply Br. at 10. In essence, he argues that he failed to brief the claim on postconviction appeal because he had no new evidence to support it, and he had no new evidence because the trial court denied him funding. The new evidence of brain damage came to light only when Middlebrooks's habeas attorneys drew on their own funds to conduct MRI and PET scans.

**Though Middlebrooks's argument is not without force, we ultimately cannot conclude that the trial court's denial of funds excuses Middlebrooks's failure to comply with the Tennessee court's briefing rules in presenting his ineffective-assistance-of-counsel claim on postconviction appeal. Middlebrooks could have argued deficient performance by providing evidence that it was standard practice among capital defense attorneys in the mid-1990s in Tennessee to obtain an MRI or PET scan when there are indications of brain damage. Alternatively, he could have argued, as he does now, that Dr. Smalldon's observations should have led counsel to seek a brain scan. Regarding prejudice, we acknowledge that Middlebrooks would have had more difficulty without the scans than with them in convincing the state court that the jury might have sentenced him to life. Nonetheless, Middlebrooks at least could have argued that a brain scan confirming Dr. Smalldon's suspicion of organic brain damage would have made a stronger impression on the jury. Thus, although the trial court's denial of funds certainly explains why Middlebrooks could not make his argument as forcefully as he could have with the brain scans, it does not explain his failure to make any argument at all. Accordingly, Middlebrooks has not demonstrated cause, and his claim for ineffective assistance of counsel by failure to investigate and present further evidence of brain damage is procedurally defaulted.**

2. Failure to Investigate and Present Evidence of Physical and Sexual Abuse

**In Claim 9(b) of his habeas petition, Middlebrooks argues that his trial counsel were constitutionally ineffective in failing to uncover and present evidence of the traumatic physical and sexual abuse that he endured as a child.** Specifically, Middlebrooks states that the jury never learned that he "was forced into child prostitution by his mother to make money for alcohol and drugs and was himself introduced to alcohol and drugs (including marijuana and heroin) by his mother at a very young age," or that he "was repeatedly raped, beaten, and subjected to sexual torture by family friends, relatives, his own mother, his mother's boyfriends, and his mother's customers-all with his mother's knowledge and permission." Pet'r Br. at 53-54. Furthermore, he alleges that the jury never learned that these traumatic

childhood experiences resulted in PTSD, which, according to one expert, "impaired Mr. Middlebrooks from effectively conforming his behavior to the law at the time of the offense for which he has been sentenced to death." J.A. at 1545.

**In fact, the jury heard much of this evidence from Middlebrooks's half-sister Sharon Fuchs and from Dr. Smalldon. They testified that Middlebrooks's mother sometimes took the kids to bars with her and sometimes left them there; that she brought men home for sex; that the children at times heard and saw her having sex; and that Fuchs was at times made to participate in the sex. Fuchs and Dr. Smalldon also testified that an uncle named W.T. Edwards molested Fuchs and Middlebrooks; that Fuchs witnessed a pedophile cousin named John Eugene Little anally rape Middlebrooks when Middlebrooks was thirteen or fourteen years old; that Little raped Middlebrooks multiple times; that Middlebrooks's mother knew about Little's conduct but nonetheless had him babysit the children; that she herself used to grab Middlebrooks between the legs and watch him go to the bathroom; and that she forced Middlebrooks to perform sex acts on her on a frequent basis for two to three years. After reviewing these events, Dr. Smalldon discussed common long-term effects of childhood sexual abuse, including emotional numbing, tendency to devalue oneself and others, and repressed anger. Dr. Smalldon explained that he observed many of these effects in Middlebrooks and that he believed Middlebrooks suffered from severe borderline personality disorder.**

**To be sure, Middlebrooks now highlights details that his trial counsel did not bring out. Middlebrooks presents evidence that he was raped by Little at age eight, that Little beat him and tortured his sexual organs, that his mother routinely had full intercourse with him beginning when he was ten years old, and that she prostituted Middlebrooks to men who would orally or anally rape him. Middlebrooks also provides a new diagnosis of PTSD.** The critical question in our Sixth Amendment analysis is whether trial counsel were ineffective in failing to bring out these additional details.

We do not reach this question, however, because we conclude that Middlebrooks has procedurally defaulted Claim 9(b). As with Claim 9(a), Middlebrooks failed to brief this issue on appeal of the denial of his petition for postconviction relief, and the appeals court denied relief based on Tennessee Court of Criminal Appeals Rule 10(b) and Tennessee Rules of Appellate Procedure 27(a)(7) and 27(g). **For the reasons discussed above, this procedural ruling was an independent and adequate state ground for denying the claim. Middlebrooks makes no attempt to demonstrate cause and prejudice or to argue that he meets the miscarriage-of-justice exception. The doctrine of procedural default therefore bars federal habeas review.**

3. Failure Adequately to Prepare for the Testimony of Dr. Jeffrey Smalldon

In Claim 9(e) of his habeas petition, **Middlebrooks argues that trial counsel provided ineffective assistance in either putting Dr. Smalldon on the stand or failing to prepare him to provide stronger testimony and avoid being devastated on cross-examination. Middlebrooks did not address this claim in his opening brief here. Even after the State pointed out the omission, Middlebrooks failed to argue the claim in his reply brief. The issue is therefore abandoned. <u>Geboy v. Brigano</u>, 489 F.3d 752, 766-67 (6th Cir.2007).**

4. Failure to Investigate and Present Evidence of the Relative Dominance of Roger Brewington

In Claim 9(hh) of his habeas petition, Middlebrooks argues that his trial counsel provided ineffective assistance by failing to present mitigating evidence of Brewington's dominance over Middlebrooks in Majors's murder. Because the Tennessee Court of Criminal Appeals resolved this claim on the merits on postconviction review, it is properly before us. The state court declined to decide whether trial counsel's performance was deficient and rejected the claim based on lack of prejudice. Therefore, we review the performance prong of the claim de novo but the prejudice determination under AEDPA deference.

**Middlebrooks's sentencing jury did hear some evidence that Brewington was the leader in the murder. This evidence came in through Middlebrooks's videotaped confession and Dr. Smalldon's testimony. In the confession, Middlebrooks described Brewington as the leader, recounting that Brewington dragged Majors into the woods, tied his hands and beat him with brass knuckles, tortured his genitals, repeatedly dropped a knife on him, and urinated in his mouth. Middlebrooks explained that Brewington challenged him to stab Majors and that after refusing initially, Middlebrooks did so only after Brewington first stabbed Majors. Middlebrooks claimed that he stabbed Majors to prove himself to Brewington and to end Majors's ordeal. Middlebrooks also said that he did not stop Brewington from torturing Majors because he was afraid of Brewington. Dr. Smalldon confirmed that Middlebrooks claimed to have stabbed Majors under pressure from Brewington and that he feared Brewington. Dr. Smalldon also reported that, according to Middlebrooks, Brewington told Majors that he would sacrifice Majors to Satan. Based on his examinations, Dr. Smalldon further opined that Middlebrooks had a weak personality and could be egged on to commit crimes. In addition to advancing this evidence, trial counsel touched briefly on the relative-dominance theory of mitigation in closing argument, stating that "[o]nly when Roger Brewington, bigger, not as old in the point of chronology, but when Roger Brewington shows up, that is when the trouble starts." J.A. at 926.**

During postconviction proceedings, Middlebrooks advanced several additional pieces of evidence supporting his relative-dominance theory of mitigation. These included (1) a 1987 report by clinical psychologist Kenneth Anchor who examined Brewington and wrote that Brewington had "poor impulse control," "unsocialized, aggressive behavior," and a "volatile temperament" and that Brewington showed no remorse for his role in Majors's murder, J.A. at 1488-89; (2) foster care records repeatedly citing Brewington's tendency to manipulate others and "to dominate the other students," J.A. at 1491; (3) testimony by a police officer at Brewington's trial that Brewington appeared to be twenty or twenty-five years old and that Brewington showed no remorse for his actions; (4) a signed statement by Brewington swearing to serve the devil; (5) racist cartoons and writings by Brewington; (6) documentation that Brewington assaulted a juvenile detention center officer in 1987; (7) admissions from Brewington that he was under the influence of cocaine and had consumed a case of beer the day of the murder; and (8) Brewington's presentence report, reflecting the State's argument for a sentencing enhancement because "it is obvious that the actual acts which the defendant admitted inflicting upon the victim showed him to be a leader and not a follower," J.A. at 1474. In addition, psychologist Dr. Jay Woodman testified at the postconviction evidentiary hearing based on a prison interview with Brewington that Brewington had a "domineering" personality and was "impervious to peer criticism or peer pressure." Postconviction Hr'g Tr. at 129, 131 (Dist. Ct. Doc. 22, Addendum 6). Dr. Woodman, who had also examined Middlebrooks, testified that "Middlebrooks would be much more likely to follow someone else's lead." Id. at 132.

Middlebrooks's trial counsel testified at the postconviction evidentiary hearing that they knew that Brewington looked older than he was, that they were aware of Dr. Anchor's report, that they had seen some but not all of Brewington's social-history documents, and that they had reviewed the transcripts of Brewington's trial. Although counsel intended to emphasize at resentencing that, "of the players involved, [Middlebrooks] was the lesser player," J.A. at 1240, they did not present all of the evidence of Brewington's relative dominance that they did uncover or seek more evidence because they were concerned that the State would call Brewington to the stand in rebuttal. That is, trial counsel made a strategic decision not to investigate and present further evidence of Brewington's dominant role in the murder. The record provides a basis for counsel's concern about provoking harmful testimony from Brewington. Brewington had given a statement to the police indicating that Middlebrooks told Majors to remove his clothes, that Middlebrooks made the decision to kill Majors, and that Middlebrooks was responsible for both stabs to Majors's body. See Middlebrooks, 2003 WL 61244, at *4. Moreover, Brewington maintained at his own trial that Middlebrooks had dropped the knife on Majors, seemed to enjoy himself while tormenting Majors, and did all of the fatal stabbing.

14

In light of these facts, we conclude that Middlebrooks has not overcome the presumption that trial counsel's strategy was reasonable. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

**Middlebrooks makes a second, more compelling argument that his trial counsel rendered constitutionally ineffective assistance. At the postconviction hearing, Middlebrooks's trial counsel testified that they likely had not seen Brewington's presentence report and did not know that the State had requested a leadership enhancement for Brewington. Middlebrooks contends that had the jury been informed (1) that the State had sought a sentencing enhancement based on role at Brewington's sentencing, and (2) that Brewington received a life sentence, the jury would not have returned the death penalty.**

This argument is not without force. Under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a sentencing jury is able to consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 604, 98 S.Ct. 2954 (emphasis omitted). Ohio has opened the field even more widely than required by Lockett, specifying as mitigating "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." Ohio Rev.Code § 2929.04(B)(7). And the Supreme Court has recognized that some states treat the universe of mitigation evidence as encompassing information that a more culpable co-defendant received a lighter sentence. See Parker v. Dugger, 498 U.S. 308, 314-16, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) (describing fact that co-defendant pleaded guilty to second-degree murder as proper mitigation evidence in Florida); see also Meyer v. Branker, 506 F.3d 358, 375-76 (4th Cir.2007) (holding that states may, but are not constitutionally required to, permit consideration of such evidence as mitigating); Beardslee v. Woodford, 358 F.3d 560, 579 (9th Cir.2004) (same). Thus, counsel's failure to inform the jury that the prosecution viewed Brewington as the chief perpetrator and that Brewington received a life term might have constituted deficient performance.

Furthermore, the argument is not vitiated by the fact that minors were ineligible for the death penalty in Tennessee at the time of Brewington's sentencing. See Tenn.Code Ann. § 37-1-134(a)(1). The jury might have judged Middlebrooks to be less death-worthy than Brewington, and it might have opted to sentence Middlebrooks to life to avoid the injustice of punishing the follower more severely than the leader.

**Even if Middlebrooks's counsel rendered deficient performance in failing to highlight the State's view of Brewington, however, we cannot say that that failure prejudiced Middlebrooks in the constitutional sense. The prosecution put on substantial evidence in support of a death sentence, emphasizing the**

**evidence that Majors was tortured for hours before dying: bruises, lacerations, and burns covered his body; the perpetrators had urinated in his mouth; a knife had been dropped on him repeatedly; an "X" with a vertical line through it had been carved into Majors's chest while he was still alive; and the two stab wounds caused him to bleed to death while he was still conscious. Middlebrooks presented some evidence that Brewington was the leading figure in the murder (in addition to other mitigation evidence concerning Middlebrooks's mental health). The additional evidence that even the State considered Brewington the leader and that Brewington received a life sentence certainly would have buttressed Middlebrooks's case for life, but the issue is whether there is a reasonable probability that it would have led the jury ultimately to choose life over death. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The Tennessee Court of Criminal Appeals answered that question in the negative. It concluded that "no degree of finger-pointing to the sixteen-year-old co-defendant would have affected the jury's verdict in light of the hours of torture to the young victim which ended when the petitioner viciously stabbed the victim." Middlebrooks, 2003 WL 61244, at *11. Constrained by AEDPA, we must affirm because we cannot say that the state court's application of Strickland's prejudice prong was unreasonable.**

Id. at 535-541 (emphasis added).

For the requested second evidentiary hearing, Petitioner lists the reports of several doctors: Dr. David Lisak, a psychologist; Dr. Craig W. Beaver, a Clinical Neuropsychologist; Dr. George W. Woods, a specialist in neuropsychiatry; Dr. Robert Kessler, a neurologist; and Dr. Lucy Brown, a neurologist, as well as affidavits from David C. Stebbins, and Herschel Koger, Petitioner's state post conviction counsel. (Docket Entry Nos. 102-1 through 102-4, 102-7, 102-8 and 102-12).

As to the doctors, Dr. Lisak analyzes Petitioner's childhood abuse and drug and alcohol addictions. (Docket Entry No. 102-1 at 1-13). Dr. Beaver conducted neuropsychometric tests and found Petitioner to have "neurocognitive deficits and potential neurological status." (Docket Entry No. 102-2 at 2-11, 12). Dr. Woods who specializes in neuropsychiatry evaluated Petitioner and his diagnosis was Post Traumatic Stress Disorder, Chronic Severe Depression, anxiety, psychosis, symptom exaggeration, impulsivity, anger, inability to modulate emotions, disassociative states, and

emotional numbing" and "significant neurological impairments" that Dr. Woods opines existed at the time of the offense. (Docket Entry No. 102-3 at 3, 4). Dr. Brown, a neuroscientist, and Dr. Kessler, a neurologist and radiologist, opine that the PET scan and MIR reveal that Petitioner has profound metabolism and an abnormal corpus striatum. (Docket Entry No. 102- 7 at 2, 3) that "may impair the individual's social judgement and control of emotional behavior." (Docket Entry No. 102- 4).

The affidavit of Stebbins cites the psychological assessment of Dr. Jeffrey Smalldon, a forensic psychologist who also performed a battery of psychological tests of Petitioner. (Docket Entry No. 102-8 at 2,3). Stebbins states that a MRI and PET scan would have aided their mitigation proof about Petitioner's head injury and Petitioner's mental illness. Id. at 3. Koger states that he retained  Dr. Jay Woodman, a psychologist, to testify at the post conviction hearing about Petitioner's co-defendant's dominance, but did not request Dr. Woodman to perform any psychological testing. (Docket Entry No. 102-12 at 1). Koger cites his unsuccessful effort to get the state trial judge to authorize  neuroimaging  tests in light of Petitioner  being  stabbed in the head with an ice pick while in prison. Id. at 2.

The state post conviction appeal reveals that

post-conviction counsel explained that the petitioner had been stabbed in the head with an ice pick years prior to the offense. According to post-conviction counsel, trial counsel was aware of the injury and Dr. Smalldon testified about it, but no tests were performed to confirm the petitioner suffered from organic brain damage. The neurological radiologist informed post-conviction counsel that an MRI could detect such brain damage and, if damage were detected, a PET scan would also be necessary. The post-conviction court denied the petitioner's motion because Dr. Smalldon testified at the resentencing hearing that the petitioner had organic brain damage, and the petitioner had not met his burden of showing the need  for expert services.

17

Middlebrooks, 2003 WL 61244 at *8.

The appellate court concluded:

> We conclude the post-conviction court did not abuse its discretion in denying the petitioner's motion for funds to hire a neurological radiologist. The record shows the proof presented by the petitioner at resentencing established the petitioner had organic brain damage. The petitioner failed to prove the expert's services were necessary for establishing a ground for post-conviction relief; more specifically, he failed to establish that services of the expert were required to prove trial counsel was ineffective for failing to seek funds to hire a neurological radiologist or to conduct an MRI and/or PET scan upon the petitioner prior to resentencing.

Id.

### C. Conclusions of Law

For an evidentiary hearing in a habeas action, in the AEDPA, Congress redefined the standards:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claims relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) **a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense**.

28 U.S.C.§ 2254(e)(2) (emphasis added).

In Williams v. Taylor, 529 U.S. 420 (2000), the Supreme Court explained that if the petitioner demonstrated diligence, then the inquiry ends, but if there is an issue of diligence the focus is on whether the petitioner or his counsel knew of the matters at issue and failed to pursue the matter:

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts . . . **Diligence for purposes of the opening**

**clause [on Section 2254(e)(2)] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court;** it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful.

\* \* \*

**For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.**

\* \* \*

Given knowledge of the report's existence and potential importance, a diligent attorney would have done more. Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2).

**As we hold there was a failure to develop the factual basis of this <u>Brady</u> claim in state court, we must determine if the requirements in the balance of § 2254(e)(2) are satisfied so that petitioner's failure is excused ... upon a showing, by clear and convincing evidence, that no reasonable factfinder would have found petitioner guilty of capital murder but for the alleged constitutional error.**

<u>Id.</u> at 435, 437, 439-440.

Independent of § 2254(e)(2), the Court also has the inherent authority to set an evidentiary hearing in a habeas action. <u>Abdur' Rahman v. Bell</u>, 226 F.3d 696, 705-06 (6th Cir. 2000). "[A] district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." <u>Id.</u> at 705. Such hearings are set "to settle disputed issues of material fact." <u>Id.</u> at 706. Yet, "if [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the court] may, and

ordinarily should accept the facts as found in the hearing. But [the court] need not. In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Id. at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)). This authority extends to determine factual issues or if an inadequate record exists to resolve the petitioner's claims, on a procedural default controversy. Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Kenney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order a hearing is "when a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing is still intact following Williams." Abdur' Rahman, 226 F.3d at 706. Evidentiary hearings have been held to be appropriately denied where the habeas petitioner "has not shown that his . . . claims would result in no reasonable factfinder finding him guilty of the underlying offenses . . . We therefore conclude that the district court did not abuse its discretion by declining to conduct an evidentiary hearing." Abdus-Samad v. Bell, 420 F.3d 614, 626-27 (6th Cir. 2005).

More recently, in Cullen v. Pinholster, __ U.S. __, 131 S. Ct 1388 (2011), the Supreme Court expressly stated that the federal habeas review is limited to the state court record:

> **We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.** Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of,

established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time i.e., the record before the state court.

This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts. Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). "The federal habeas scheme leaves primary responsibility with the state courts ...." Visciotti, supra, at 27, 123 S.Ct. 357. Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.

Limiting § 2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision. Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. Williams v. Taylor, 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Terry Williams). If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." Id., at 413, 120 S.Ct. 1495. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court. FN3

Our recent decision in Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), is consistent as well with our holding here. We explained that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." Id., at 474, 127 S.Ct. 1933. In practical effect, we went on to note, this means that when the state-court record "precludes habeas relief" under the limitations of § 2254(d), a district court is "not required to hold an evidentiary hearing." Id., at 474, 127 S.Ct. 1933 (citing with approval the Ninth Circuit's recognition that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record" (internal quotation marks omitted)).

Id. at 1398-99 (footnote omitted). Yet, the Sixth Circuit has since explained that Pinholster "was not a wholesale bar on federal evidentiary hearings . . . such as when the State court decision was not an adjudication on the merits." McClellan v. Rapelje, 703 F.3d 344, 356 (6th Cir. 2013).

As stated earlier, Martinez created an equitable exception to procedural default that "qualifies Coleman **by recognizing a narrow exception**: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315 (emphasis added). In addition, Martinez applies to "initial-review collateral proceedings", "which provide the first occasion to raise a claim of ineffective assistance at trial." Id. Martinez expressly recognized that "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the [ineffective assistance of trial counsel] claim." Id. at 1318. In Trevino v. Thaler, __ U.S.__, 133 S. Ct. 1911 (2013), the Supreme Court extended the Martinez exception where State law "does not expressly *require* the defendant to raise a claim of ineffective assistance of trial counsel in an initial *collateral review* proceeding....[but the State] law on its face appears to permit (but not require) the defendant to raise the claim on *direct appeal*." Id. at 1918 (emphasis in the original). Moreover, "[t]o be successful under Trevino, . . . [the habeas petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. McGuire v. Warden, Chillicothe Correctional Inst.738 F.3d 741, 752 (6th Cir. 2013) (citing Trevino, 133 S.Ct. at 1918). "The holding in [Martinez] does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first

22

occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." Martinez, 132 S.Ct. at 1320; Wallace v. Sexton, No. 13–5331, 2014 WL 2782009, at *10 (6th Cir. June 20, 2014).

Based upon an analysis of Tennessee's system, this member of the Court concluded, consistent with Trevino, that Tennessee's system by "'design and operation makes it **highly unlikely** in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal.'" Morrow v. Brandon, No. 3:06–0955, 2014 WL 49817 at *9 (M.D. Tenn. Jan. 7, 2014) (quoting Trevino, 133 S. Ct. at 1921 and citing Fenton v. Colson, No. 3:09cv1057, 2013 WL 704317 at *13 (M.D. Tenn. Feb. 25, 2013)) (emphasis in Brandon). In Sutton v. Carpenter, 745 F.3d 787 (6th Cir. 2014), the Sixth Circuit ruled that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." Id. at 795-96 (citing Martinez, 132 S. Ct. at 1320). Although Petitioner's claims about his post conviction counsel may be raised under Martinez, the necessity of an evidentiary hearing on Petitioner's claims about his counsel is a separate issue.

Petitioner's personal history that is cited in some of the proferred expert proof about Petitioner's childhood abuse and emotional disorders was presented to the Sixth Circuit in the earlier federal habeas appeal: **"To be sure, Middlebrooks now highlights details that his trial counsel did not bring out. Middlebrooks presents evidence that he was raped by Little at age eight, that Little beat him and tortured his sexual organs, that his mother routinely had full intercourse with him beginning when he was ten years old, and that she prostituted Middlebrooks to men who would orally or anally rape him. Middlebrooks also provides a new**

23

**diagnosis of PTSD."** Middlebrooks, 619 F.3d at 537-38 (emphasis added).

As to the MRI and Pet scan proof and related expert opinions, Petitioner's proof reflects neurological tests in 2005, 18 years after the crime was committed in 1987. With an evidentiary hearing, there would be testimony on Petitioner's condition twenty seven years after the offense. As the Sixth Circuit has stated:

> In his federal habeas petition, Strouth seeks to "supplement[ ]" the record with "expert evaluations of his longstanding mental illness." Br. at 99–100. But in reviewing the state court's resolution of Strouth's claim, federal courts must "limit[ ]" themselves to "the record that was before the state court." Cullen v. Pinholster, 563 U.S. ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). The new mental-health evidence has no bearing on whether AEDPA permits us to grant him habeas relief on this claim. And because that is the only ground on which Strouth seeks relief with respect to this claim, the claim necessarily fails. Even if that were not the case, the district court's reasoning on this score independently suffices to reject this claim: **recent mental evaluations offer little insight into Strouth's state of mind twenty-five-plus years ago, as the state courts reasonably concluded in finding no prejudice.**

Strouth v. Colson, 680 F.3d 596, 603 (6th Cir. 2012).

In sum, in the Court's view, Petitioner's defaulted claims and the evidentiary bases for those claims about the ineffectiveness of his trial and post conviction counsel were presented to the Sixth Circuit. Yet, despite these facts, the Sixth Circuit did not find cause or prejudice to excuse petitioner's procedural defaults. In discussing Petitioner's various claims about his counsel, the Sixth Circuit concluded that

> Middlebrooks has not demonstrated cause, and his claim for ineffective assistance of counsel by failure to investigate and present further evidence of brain damage is procedurally defaulted.... Middlebrooks makes no attempt to demonstrate cause and prejudice or to argue that he meets the miscarriage-of-justice exception ... Even if Middlebrooks's counsel rendered deficient performance in failing to highlight the State's view of Brewington, however, we cannot say that that failure prejudiced Middlebrooks in the constitutional sense. ... Constrained by AEDPA, we must affirm because we cannot say that the state court's application of Strickland's prejudice

prong was unreasonable.

Middlebrooks, 619 F.3d at 537, 538, 540, 541.

This Court concludes that in such instances, another evidentiary hearing is unnecessary. Under Trevino and McGuire, the Martinez claims must be "substantial." McGuire, 738 F.3d at 752 (quoting Trevino, 133 S. Ct. at 1918). If the proof on the claims about Petitioner's trial counsel's omissions were insufficient to establish cause or prejudice in Petitioner's earlier federal habeas appeal, then this Court concludes that those same claims do not qualify as "substantial" claims under Martinez and Trevino to warrant further habeas review.

As to Petitioner's claim of trial counsel's failure to investigate and present evidence of physical and sexual abuse, the jury heard much of this evidence. Middlebrooks, 619 F.3d at 537. The additional details that Petitioner highlights that trial counsel did not present are cumulative and do not constitute a substantial claim.

For these reasons, the Court concludes that the Respondent's motion for judgment on the pleadings should be granted and Petitioner's request for an evidentiary hearing be denied. The Court grants a Certificate of Appealability on the issues of whether Petitioner's claims about his trial and post conviction counsel's omissions justify an evidentiary hearing and habeas relief under Martinez and Trevino.

An appropriate Order is filed herewith.

**ENTERED** this the _____ day of August, 2014.

William J. Haynes, Jr.
Chief United States District Judge